Thank you Judge Smith. May it please the court. My name is Jordan Redman and I represent the state of Louisiana in this expedited appeal. The question presented is whether the state of Louisiana suffers an Article III injury when a federal agency unlawfully regulates the taking of Louisiana shrimp in Louisiana's waters in a manner that is harming Louisiana's industry. The district court held no, reversing its prior published opinion, finding, standing, and relying on arguments raised in a reply brief. The district court concluded Louisiana lacks standing to challenge a regulation of its own shrimp in its own waters. That holding is wrong. Louisiana demonstrated its injuries to its sovereign, quasi-sovereign, and proprietary interests. The court can reverse on any one. Which do you think is your strongest? Why don't you start with whatever you think is your strongest? Yes, Your Honor. I think the strongest argument is that we suffered an injury based on our interest in and ownership of the shrimp in our waters and regulation of them. I think that was the basis for Judge Pat Carr's decision in the Gus District Court case that resulted in the Gus case that you said in 1988. I recognize standing was not at issue on appeal, but I think that was the correct analysis. I think that it becomes even clearer when you think of injury in fact as purely an invasion of a legally protected interest. That's how this court has described it in Duarte. It's how the court described it even in Lujan. And I think the state has, at the very least, a legally protected interest. Why aren't the shrimpers the proper plaintiffs rather than the state? Certainly, Judge Clement, the shrimpers could have sued, but the state also has interests at stake here. It has its sovereign interests, quasi-sovereign interests, and proprietary interests. It is the state's interest in, for example, creating and enforcing a legal code that is impaired when one of its regulations is essentially denied effect by virtue of federal law. Did you invite the shrimpers to join as plaintiffs? To my knowledge, we did not, Your Honor. We did not because, you know, as a practical matter, I think even as the final rule itself recognized, for example, at ROA 1037, most of these shrimpers are operating on small, you know, positive or negative economic margins, and it was just, as a practical matter, it made sense for the state, through the Department of Wildlife and Fisheries, to bring this lawsuit challenging the final rule. So how do you quantify the sovereign or the quasi-sovereign interest in the case? I mean, what the district court found was, well, it wasn't enough for Louisiana to cite its complaint allegations. You've got to have some proof of injury at summary judgment. So how do you quantify it? Your Honor, I think the injury is purely, it arises as a matter of law based on, you know, the black letter law that Louisiana has an interest in this area, in the shrimp and in the regulation of them, on the one hand. And on the other hand, you have the final rule, the text of which establishes the invasion of that interest. And I don't think any further showing in the way of evidence was required in order to establish that. So you're talking about in the final rule, you're talking about the analysis about the economic harm, the reduction in shrimping boats, the effect on the trawlers, the effect on, you know, that, or is it something different? Well, I think that's part of it. I think it's just the fact that a federal agency is invading the, an area of state regulation, traditional state regulation for, in a manner that the state believes is unlawful. I think that's an injury similar to, you know, the injury that sufficed in, you know, the, it's an old case, admittedly, but the Missouri versus Holland case where Missouri had standing in, to file a bill in equity to challenge federal wildlife enforcement of a state law that invaded the state's right to control the regulation of the taking of birds within the state. And so too, I think the court's opinion in Brackeen versus Holland is somewhat instructive. I don't think the court required evidence that, that the, it was implementing regulations, you know, affected the state's control of its own child custody proceedings. This is distinct from, like, economic dollars and cents. Yes, it's a separate injury, Your Honor. The state's interest in its natural resources and policing those and et cetera and so forth. Yes, sir. That's, that's right. It's a separate interest. Is there a financial loss, a cost to this change? There is, Your Honor. The, as far as the bases of standing that we're relying on, it's added law enforcement costs as a result of the addition. We don't have that responsibility. It's true that the text of the final rule, Your Honor, does not on its face require the LDWF to enforce it, but under state law, that's revised statute 56 colon 493, LDWF is vested with exclusive control of the Louisiana shrimping industry and LDWF is required to, I think, quote, enforce the laws regulating the same or something like that, which, which LDWF interprets to mean that LDWF has to enforce even this, this, this federal, federal law, federal rule, sorry. I thought you were also claiming a loss of a certain amount of tax revenue. We, we were, Your Honor. We, we didn't raise that in our, in our, well, stepping back, Your Honor, we, we raised as part of our quasi-sovereign standing, we, we said that the final rule injured the economic well-being of the state in general and by reducing the amount of shrimp that were landed, that reduced the, the, the, you know. I thought that was more parents patriae. It, it, you know, Your Honor, there's some debate in the scholarship and in the cases even about the difference between permissible parents patriae standing and impermissible third party standing. I think that in, you know, Alfred, Alfred Snapp, for example, it, the court made the distinction that a quasi-sovereign interest based on the economic well-being of the state's population in general is an interest that is held by the state as a state and it's not an interest held by individuals within the state. It's not, we're not seeking to vindicate the interests of individual shrimp skimmers. We're seeking to vindicate the interests of the state in general. I think Judge Bush's opinion for the Sixth Circuit in Kentucky versus Biden, you know, we acknowledge it was a, a stay case, but it helpfully distinguishes between impermissible parents patriae standing and permissible quasi-sovereign standing. Back to Judge Smith's question about tax revenue directly to the state. I mean, is that part of your contention or is it not? So, I mean, I read the brief and it's, if it's in there, it's very fleeting. It's, it's, it's part of our argument insofar as it relates to our standing in our quasi-sovereign capacity. Be specific, what is it then? What is the in the manner contemplated by the final rule, you know, 6% and, and a loss of average shrimp catch of 6% is, is, is going to inevitably, inevitably, you know, impact Louisiana's, Louisiana's economy. Well, you, I think you, you have us maybe confused. I thought you were making a separate, you might not have spent much time on it, but a separate claim about the shrimp excise tax and the loss of that. It's, it's a small amount, but it's, it's a loss of, of direct tax revenue, right? Well, to be candid, Your Honor, we did not make that argument in our brief. It was raised in our complaint, but that was not in our brief hearing appeal. So, is it waived? I, I, I think the, the, the court could certainly address the issue if it, if it would like to. Forfeiture is always discretionary, I think that the state is a party, it's supposed to have special rights and access to the federal courts. The complaint specified excise tax, didn't it? Yes, Your Honor. It, it specified the, the specific shrimp excise tax. Are you, are you, are you, are you relying on a special solicitor? Yes, Your Honor. We don't, we don't think, we think we need it only in the sense that states can vindicate interests that ordinary parties can't vindicate. I, I didn't take the government to dispute our traceability or redressability. I think all that's at issue is injury in fact. And, you know, I think special solicitude doesn't erase the injury in fact requirement, but it does change the sorts of injuries that a sovereign state can vindicate in, in litigation. For example, the sovereign injuries we discussed and that were, you know, deemed sufficient to confer standing in, for example, Brackeen or Missouri v. Holland. Does special solicitude get you over the line if it's a close case in terms of injury? I think, I, I think it could, Your Honor. I think it, it, it, it could cause some dispute as to, you know, whether the injury is, is, is speculative. And, and it, it kind of, you know, for example, in Massachusetts where the court found an injury was not too speculative where, you know, the, the EPA's decision not to regulate could have caused people to drive less fuel efficient cars, which could have caused global sea levels to rise, which could have caused a erosion of Massachusetts coastline. I, I think it, it, it, you know, maybe operates as a tie goes to the runner type principle. I think one thing we haven't discussed, Your Honor, is the state's standing based on its interest in creating and enforcing legal code. This is the variant of the standing by preemption argument. You know, the state has long regulated the use of turtle excluder devices in Louisiana waters. It's decided that tow times suffice to protect, to, to protect Louisiana. And, and, and, and, you know, it's specifically deemed tow times are, are, are good enough for that, for that purpose. Was that raised below this argument, regulatory preemption? We didn't use the word preemption below, Your Honor, but we used. What words did you use to preserve it? We used the, the word that we had, we had standing in our sovereign capacity, which we take the standing by preemption argument as a variant of our, you know, standing in our sovereign capacity. Can, can we get to that argument if you just sort of take it as a variant? In other words, if, if sovereign capacity is, well, the interest in our natural resources and, and, and the shrimp or all the natural resources, I guess, does that get us to regulatory preemption? I, I think, I think the state's interest in creating and enforcing a legal code, which we at least raised insofar as we cited, you know, Judge Smith's DAPA case and, and Texas versus Biden. I, you know, fully acknowledge we didn't use the word preemption, but I think. The district court didn't address this issue, right? That, that's right, Your Honor. Was it squarely presented to the district court for decision so that it's preserved for us to reach? The, the issue of sovereign capacity standing was, but like I said, we didn't raise. Does that give you a hook for anything you can now say is sovereign capacity related to raise it? I, I wouldn't say not, not anything, Your Honor, but we did cite a case that, that stands for the proposition that states can have standing in their sovereign capacity based on preemption concerns, and I think the case the government cited, Arbol versus Ultimis, is instructive on that point. There, Judge Ho said that, you know, a, a 1983 plaintiff preserved a standing argument by citing the case that stood for the proposition that, you know, standing existed for the arguments the plaintiff was trying to raise. And I, I, I think, you know, to the extent the court disagrees that we've, we've preserved that argument, I think it would, the court should still address it if it disagrees with our other standing arguments just because it would work a manifest injustice. It's clearly a, a pure question of law. Standing is always a pure question of law. But we had no reason to raise the issue any more specifically below. We were relying on the district court's published opinion concluding that we had standing based on our interest in and ownership of our shrimp, and then we, you know, had no reason to believe the district court was going to reverse that conclusion. That, that holding was not contingent on any, you know, factual presentation. Did the state ask for leave to file us a reply to the government's reply in support of summary judgment? It, it didn't, Your Honor. I don't think it was required to under this court's precedent, or under the precedent, we couldn't find a precedent of this court on point, but just as a, as a general matter. And Louisiana wouldn't have had any reason to, it had no reason to believe the district court was going to, you know, change its mind as to the basis for the state's standing. Standing was an issue at the P.I. stage and the district court. It's not so much the district court changed its mind, it was a different phase of the case. Well, it's a different phase of the case, but it was presented with the same evidentiary package, and the, the district court, you know, that standing on that basis was not contingent on any presentation of facts. I think it arose as a matter of law based on just the fact that the final rule invades sovereign interest, the fact that the final rule, you know, invades the sovereign interest. So my time's up. Yes, you've, you've saved time for rebuttal. Thank you, Mr. Redmond. Mr. Birney. Thank you, Judge Smith. Good morning. May it please the Court. Andrew Birney on behalf of the United States. The district court correctly held that Louisiana failed to establish its standing at summary judgment. I'd like to just jump right into the grounds of standing Louisiana asserts. I think maybe the most straightforward one to deal with first is this proprietary theory of standing based on alleged diversion of enforcement resources. I mean, we think that fails for three straightforward reasons. One of them, Judge Clement, you identified the rule does not require them to enforce it. It's questionable whether constitutionally we could require them to enforce it. But even if they're not required to enforce, enforce it, I mean, you've got this Colonel Hebert declaration that says we're going to have to devote resources to it. You've got arguably inconsistent federal regulation with state regulation. And as a practical matter, when they're sitting in the Department of Wildlife and Fisheries, they've got to train their officers on what to do. I mean, isn't that a cost? I don't think so, Judge Wilson, for a few reasons. First of all, I mean, Hebert declaration does say that we will enforce it, but it doesn't provide any reason why they have to enforce it. It's not a matter of have to. It's a matter of they've got to enforce their, their laws, right? The state's laws, regulations, correct? They can force their regulation, but for purposes... But then they've got to deal with the federal regulation that's inconsistent with the state regulation, correct? No, not in the sense that you... They can just ignore the federal regulations. Well, so I think they can ignore it in the sense that they don't have to enforce it, but compliance with either the federal regulation or their tow time, compliance with the federal regulation satisfies, satisfies their state regulation, which... But they have to enforce the federal regulation, practically speaking. No, they don't. They don't. And I mean, that's the first part. To be clear, there are three reasons. The first part of our argument is we don't think they need to enforce it, and I just want to briefly get to the statute that Mr. Redman cites, Section 593. All that statute says is, is that LDWF shall enforce laws and regulations. I think it would be fairly remarkable to read that statute as saying they're required to enforce the regulation of another sovereign, that they don't have any enforcement discretion, even whereas here they disagree with that regulation and, in fact, think it's unconstitutional. But that's just one reason, Judge Wilson, why we don't think this is an Article III injury, that they don't have to enforce it. The second reason, and this is set forth in the Antonaris Declaration at ROA 1402 and 1403, is that there's a process in place for them to request additional funds from NIMFS and for enforcement purposes, and as far as we know, they haven't done so. Now, it is true that they say in a declaration filed in support for their motion for a TRO at the beginning of the case, this is an ROA 99 to 100, that new funds are not anticipated to be forthcoming, but they've never explained that statement. They never say whether they've asked for funds and those funds were denied, so we don't think that's sufficient to create a genuine issue of material fact. But even if you ignore all of that, even if you assume they're entitled to enforce the rule, even if you assume that there will be no additional funds, certainly nothing in the rule or the JEA process requires them to enforce it beyond the funds NIMFS provides in any given year. So, for example, as we said in our brief, the 2020 JEA gives LDWF about $880,000 for federal enforcement purposes and $293,000 for TED enforcement in particular. Certainly, if those funds are exhausted, they're not required to enforce the federal regulations over and above what the funds NIMFS has provided. So we think just however you look at it, there's... If they have to divert resources to train their officers to know the difference between the inconsistent regulations, is that enough of an injury? Perhaps. I think that would have to be articulated. I don't think there's anything like that here. As a practical matter, that's what they're going to have to do. I don't think there's any reason they would have to do that. If they want to enforce their tow time restrictions, they can. If they want to require shrimpers to abide by their tow time restrictions, even if they have TEDs installed, they can. As far as we're concerned, they can just ignore this rule completely. I don't think there's any showing, just for all of those three reasons, and any of them independently, that they have to expend scarce enforcement resources. Are they going to lose the federal funds to enforce the federal regulations if they ignore the federal regulation entirely? So the way the JEA process works is each year it's negotiated and there's a specified amount of funds that are agreed to for enforcement of federal enforcement priorities. They can It's economically inefficient. We're not going to enforce it. Yes, I think what would happen there is that the funds earmarked specifically for federal enforcement, they would have to either pay them back or wouldn't be given them, but that's not an issue. How is that not an injury? Those injuries are earmarked for enforcement of the federal rule. They wouldn't exist. They don't have to enforce the federal regulation, but you're going to lose your funding if you don't. No, no, no. Not funding generally, Your Honor. Just the funding that is agreed to for enforcement of this specific rule. Isn't that enough to cause an injury? No, I don't think so because they have a choice of either not enforcing the federal rule or enforcing the federal rule of federal funds. I don't see how that can be an Article 3 injury if they decide not to enforce a federal rule and they don't use federal funds for that purpose. What if the shrimpers were added as plaintiffs? Wouldn't that solve the standing issue? Surely the shrimpers have standing, and if one plaintiff has standing, they all have standing. I'm sorry, Your Honor. I got overeager. I didn't mean to interrupt. We think, I mean, I think, I think perhaps, I mean, we certainly think it is very likely. I mean, if a particular shrimp are added, we want to probe the factual allegations, what costs they say they have to incur, but we're not, I think the basic answer to your view, and I think it's quite possible, perhaps even likely, that at least some shrimpers would have standing to challenge this rule. We just think that they're the proper, they're the proper parties here. If the state applied for the additional money that was available and was denied, would they have then standing? I guess it depends. If they said we're not going to enforce this rule, but we want money to enforce the rule either, I don't know. Well, back up. Let's just say Colonel Hebert's declaration, it's going to cost us more to enforce, and you said one of the reasons that argument doesn't carry water is because there's federal funding available to enforce the extra rule, so if they apply for it and are denied, or it's insufficient per Colonel Hebert or whomever else at the department, would the state then not have standing? So, Judge Wilson, I think that if they applied for funding and were denied in the way you described, I just want to be precise here, I think that would eliminate the second of the three arguments I said, the argument that they could always request more money, but there's no evidence they've done so. I still think we would have our first and third argument, which is that they have no obligation to enforce this rule in the first place, and that they have no obligation to enforce the rule above and beyond any funds NIMS has provided. I just emphasize, though, that those obviously aren't the facts of this case. We've said from the beginning at the preliminary injunction that they've never asked for additional funds, and I don't believe Well, they've said that the funds are not expected. How's that different? Again, I think the timing here is important. He said that at the very beginning of the case, when they moved for an ex parte TRO, I believe it was on August 11, 2019, we later explained that there's a process in place and they had never requested additional funds, and they haven't disputed that since, so I believe the fact that they've never explained was sufficient to create a genuine issue of material fact, as the district court found. Let's talk about the sovereign interest. How does Louisiana not have standing to police its natural resources? I think they don't have standing because whatever interests they have in the shrimp and their waters, and there's a dispute in the briefs about whether that interest amounts to ownership or not. We don't think that that has any bearing on it. They haven't shown any cognizable injury to that. The rule itself talks about the cognizable injury, doesn't it? No, to be clear, Your Honor, I think it's important to keep things straight. The rule talks about potential economic injuries to shrimpers. What we're talking about when it comes to the sovereign interest is not economic injuries, but they claim, and I heard Mr. Redman to repeat this, that they just have an injury as a matter of law based on the fact of our regulation of shrimping in their waters. The regulation details that it's going to change the amount of shrimp taken from Louisiana waters. It's going to change the amount of viable shrimping activity that goes on in Louisiana waters. It's going to change, certainly there's the economic harm and all that. We can argue whether it's parents patriae or whether it's a separate injury to the state, but it clearly impacts Louisiana's natural resources, so how is there not standing? The rule says so. What the rule said, and the rule carefully hedged, the rule said I think that it would affect by about 6% the amount of shrimp harvested from Louisiana waters. I don't think that by itself, though, it can be plausibly characterized as an injury to the sovereign interest of the state where the state isn't being directly regulated. I think that is the quintessential injury that falls on a subset of a particular regulated industry. I don't think that's an injury to Louisiana's sovereignty. That's just a regulation of private parties who are engaged in this activity in Louisiana waters. Nor does it interfere with Louisiana's ability to enforce a legal code. I think this falls into two buckets. There's the preemption, and then there's the pressure to change state law buckets. Turning to the preemption issue, we do think that this is forfeited. All throughout the complaint, the preliminary injunction briefing, the TRO briefing, two summary judgment briefs, the term preemption was never used. I don't think merely using the term sovereign interest preserves a very different and distinct argument based on preemption of state law. Do we have to reach it because it's a miscarriage of justice for us or a manifest injustice for us not to reach it? I don't see how it's a manifest injustice when this was something that there was ample opportunity to brief, and the district court never passed on, and it was raised for the first time in this court. I just certainly don't think their allusion to sovereign interest generally was sufficient to raise this specific argument. But even if you were to reach it, I don't think there's any preemption here, or at least any preemption that injures any interest of the state. I think it's important to emphasize that this does not preempt Louisiana law, at least in any traditional sense. This rule doesn't expressly preempt any Louisiana statute. There's no conflict preemption. Shrimpers can comply with both the federal and the state law. I didn't take Louisiana to dispute this. And there's no field preemption. Louisiana retains the ability to regulate in this field, and it will continue to do so. It just imposes a single additional requirement, eliminates a single available option for a small subset, a fairly small subset of a single industry. That isn't preemption by any stretch, even if this claim was preserved. I want to get to the pressure to change state law is related to that. I don't see how this pressures them in any relevant respect to change their state law. They certainly haven't identified any pressure. I think this case is very different in that respect from the DAPA case, for example. Based on the driver's license rationale, there's just nothing like that here. And I've said, and this is a continuing theme, that they can ignore this rule, both for enforcement purposes and anything else. And just to take a few of the cases Mr. Redman identified, your honors are obviously more familiar with the Brackeen case than I am, but I think that case is worlds apart from that one where ICWA required Texas state courts to apply a particular rule of law in child custody proceedings, and at least as this court found, imposed regulatory burdens directly on the state. This rule simply doesn't do that. As for the Holland case, that case obviously predates the court's modern standing jurisprudence, and I don't think that case even, it says it was a proper lawsuit, but doesn't even mention standing. So I don't think there's any support for the notion that they're just mere identification of a sovereign interest without any identifiable injury to that interest aside from federal regulation, that the fact of federal regulation itself is sufficient. So I guess I can turn to the sort of quasi-sovereign interests in terms of injury to the economy. They haven't identified any specific economic injury that is distinct from any injury to a distinct group, namely the shrimpers who are subject to this rule. So this is a classic parents-patriot action. This is, again, quite different than some of the other cases this court has considered, like the DACA case, for example, where this court found that the DACA program would cost the state of Texas a quarter million dollars annually and more than a half million dollars to local state and Texas communities. There's just nothing like that alleged, let alone proven here. And so lastly, we don't think that the district court committed any error, let alone any reversible error in the way it dealt with this case. First of all, on this ruling for the first time on arguments we made in our reply brief, I guess there's just a couple of brief points I'd like to make about that. The first one is if you actually look at those arguments, I think on ROA I believe 2569 to 2570, those are the summary judgment reply briefs. I'm not even sure to what extent it's even appropriate to describe them as new. You have essentially three arguments there. The first one is that they hadn't shown any injury to any specific loss of any specific tax revenue, which, as Mr. Redman said, isn't even a claim that they renewed in this court. The second argument was that they hadn't shown any injury to their enforcement resources, which is the same argument that was made at the PI stage and the same argument that has been amply briefed here. And the third argument was that they hadn't shown any injury to their marine resources, which was also an argument that they just not met their burden of proof. And in any event, as I heard Mr. Redman also say, there's no prejudice here. These are all pure questions of law for the most part that this court is well situated to resolve. It was also responsive to the arguments Louisiana raised in their second summary judgment brief. Their first summary judgment brief didn't specifically mention standing, and we responded to their second summary judgment brief. And so we think those arguments were responsive to that. But even putting aside that question of district court procedure, I think that there was no prejudice here. As you mentioned, I think it was you, Judge Wilson, they didn't move to strike the reply brief containing impermissible new arguments. They didn't move to file a surreply. They didn't file a motion for reconsideration. Maybe they weren't required to do any of those things as a strictly formal matter, but they certainly had ample opportunity to press any arguments they didn't think the district court had a chance to properly consider. In any event, these are for the most part legal issues that this court is amply situated to address, except we do think the preemption argument specifically was forfeited. I see I still have a few minutes left. I'm happy to address any questions the court has. All right, thank you, Mr. Burney. Thank you. Mr. Redman for rebuttal. Thank you, Judge Smith. Just a few points in rebuttal. First on law enforcement costs. Revised Statute 56-493 requires LDWF to enforce federal regulations. That's LDWF's interpretation of the rule. And under Judge Starr's opinion for the D.C. Circuit in Alaska versus Department of Transportation, the court relies on the AG's interpretation of state law when it comes to standing. He made very clear there that you don't rely on the possibility that the state's chief law enforcement officer misunderstands state law to dismiss a state when standing grounds. Second, I think it's clear we can't ignore these different federal regulations. I think, as someone noted, the declaration of Colonel Hebert makes clear that these regulations will impose additional law enforcement duties. I understand the government disputes that. That's not an issue for summary judgment. It's for trial. I understand the government also disputes that the state didn't request added joint enforcement agreement funds. But, again, the declaration says, you know, maybe the declarant didn't consult Strunk and White when he was swearing out the declaration. It could have been perhaps a little clearer. But he certainly, I think, it can be fairly inferred from the declaration that JEA funds were requested and were denied. So what you just told us is that a provision of state law requires you to enforce all federal laws. Is that right? Or just these specific ones? So revised Statute 56.493 requires LDWF to enforce laws regulating Louisiana's shrimp fishery. I think it says shrimp fishery and shrimp industry, I think is the word that the statute uses. And LDWF interprets that rule to require it to enforce this, Ted's rule, that it believes to be, that the state believes to be unlawful and in violation of the APA. On manifest injustice, I think there was not, you know, we certainly could have filed a SIR reply. We just had no reason to do so given the district court's prior holding. We viewed that as a holding as a matter of law, contingent on no facts. And I think as Judge Wilson pointed out, the injury here is not really a difference in state laws. It's a difference in state laws on an area that's been traditionally within the heartland of state police powers for 150 years or so. And it is different on a very important and sensitive topic, which is the use of these devices that are making it difficult for Louisiana shrimpers to land as much shrimp as they were landing before. But with respect to preemption, I think what matters is not whether state law has preempted any formal sense. I think both DAPA and DACA make clear that what matters is constraints on the state's ability to respond to the assertively unlawful federal action. And that's what we have here. Louisiana has no, it can't exercise its lawmaking functions to evade federal law in this area. It has no option other than to file a lawsuit in federal court seeking vacature of the final rule. If there are no further questions. All right. Thank you, Mr. Redmond. Your case is under submission and the court is in recess.